AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

JOHNISHA LASHAY HARRIEL,

Defendant(s)

Case No.    2:21-mj-03595-DUTY

```
┌─────────────────────────────────┐
│              LODGED             │
│  CLERK, U.S. DISTRICT COURT     │
│         8/4/2021                │
│  CENTRAL DISTRICT OF CALIFORNIA │
│  BY: _____ JB _____ DEPUTY      │
└─────────────────────────────────┘
```

```
┌─────────────────────────────────┐
│              FILED              │
│  CLERK, U.S. DISTRICT COURT     │
│         8/4/2021                │
│  CENTRAL DISTRICT OF CALIFORNIA │
│  BY: _____ EC _____ DEPUTY      │
└─────────────────────────────────┘
```

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 31, 2021, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Stephanie Crebbs*
*Complainant's signature*

Stephanie Crebbs, ATF SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    August 4, 2021                    _____
                                                    *Judge's signature*

City and state:   Los Angeles, California        Hon. Gail J. Standish, U.S. Magistrate Judge
                                                    *Printed name and title*

**AFFIDAVIT**

I, Stephanie Crebbs, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Johnisha Lashay Harriel ("HARRIEL") for a violation of 18 U.S.C. § 922(g)(1): Prohibited Person in Possession of Ammunition.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Manhattan Beach Police Department, in Manhattan Beach, California, as described more fully in Attachment A:

a.    One black Apple iPhone, contained in a black case, with a silver "UPS" sticker affixed to the back of the case ("SUBJECT DEVICE 1");

b.    One silver Apple iPhone, with a broken screen, contained in a floral and butterfly print case ("SUBJECT DEVICE 2"); and

c.    One black Wilko smartphone ("SUBJECT DEVICE 3").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g)(1) (Prohibited Person in Possession of a Firearm and Ammunition) (the "Subject Offense"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a sworn Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since February 2009.  I am currently assigned to the ATF Long Beach Field Office.  As a Special Agent, I have received hundreds of hours of formal and informal training in the enforcement of federal firearms laws and regulations, including training through the ATF National Academy and Federal Law Enforcement Criminal Investigator Training Program.

6.    Through working for ATF, I have conducted investigations into the unlawful sale, possession, manufacturing, transportation, and importation of firearms.  In conducting these investigations, I have used a variety of investigative techniques, including surveillance and the execution of search and arrest warrants.  Additionally, I have

worked in an undercover capacity for ATF on investigations
related to individuals selling firearms and narcotics.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.   On July 31, 2021, a Manhattan Beach Police Department
("MBPD") officer on patrol stopped HARRIELS's car after a
records check of the license plate revealed that the vehicle was
wanted by Los Angeles Sheriff's Department ("LASD") in
connection with a felony offense and that the occupants were to
be considered armed and dangerous.

8.   The officer initiated a traffic stop on the car.
HARRIEL was the sole occupant in the car.  As officers detained
HARRIEL, she was asked if she had any weapons on her person.
HARRIEL told officers that she had a firearm in her front right
pants pocket.  The officer recovered a 9mm handgun, without a
serial number (commonly referred to as a "ghost gun"), loaded
with seven rounds of ammunition, from HARRIEL's pants pocket.
The officer then searched HARRIEL's car and found an additional
magazine loaded with nine rounds of ammunition, a box containing
an additional thirty rounds, three spent ammunition shell cases,
and the SUBJECT DEVICES.

9.   In a Mirandized interview, HARRIEL admitted to
possessing the firearm.  A subsequent records check revealed
that HARRIEL has two prior felony convictions.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.  Based on my review of law enforcement reports,
conversations with other law enforcement officers, and my own
knowledge of the investigation, I am aware of the following:

**A.    LASD Deputy Garcia Issues Felony Want for HARRIEL's
Car**

11.   On July 29, 2021, LASD deputies went to a house in Los
Angeles, California in response to an assault with a deadly
weapon call for service.  At the house, the deputies made
contact with victim A.T.D.  A.T.D. told the deputies that he
arrived at his house with his grandson J.S., and saw his
daughter, HARRIEL, park her car, a silver Buick Encore, bearing
California license plate number 7LLT711, in the driveway of his
home.  A.T.D. stated that HARRIEL yelled to her son, J.S., to
get inside the house.  J.S. could not go inside the house
because the door was locked.  J.S. was standing approximately
ten feet away from A.T.D. when HARRIEL shot approximately four
to five times in the direction of A.T.D. while still sitting in
the driver's seat of her car.  A.T.D. said he dropped to the
ground once he heard the gunfire and then he saw HARRIEL drive
away from his house.

12.   Deputy Garcia, one of the LASD deputies who responded
to the call for service, saw a bullet hole in the wall of the
house, a bullet hole in a glass window of the house, and a
bullet hole in the fence outside the front of the house.

13.   Deputy Garcia then spoke to J.S. who corroborated the
statements made by A.T.D. and added that HARRIEL is known to
carry a firearm with three magazines.  J.S. stated that HARRIEL
often carries the firearm in a purse and conceals the firearm
inside the glove compartment of her car.  Based on the proximity
of J.S. toward A.T.D. when HARRIEL fired a firearm at A.T.D.,

Deputy Garcia entered a want for a felony and armed vehicle into law enforcement databases for HARRIEL's car.

**B.  MBPD Officer Stops HARRIEL's Car After Records Check of the License Plate Reveals the Car was Wanted by LASD**

14.  On July 31, 2012, at approximately 6:53 p.m., MBPD Officer Hanson was on uniformed patrol in a marked police car when he was alerted by department resources that a car, a silver 2014 Buick Encore, bearing California license plate number 7LLT711,[1] was driving northbound on Ardmore Avenue from Manhattan Beach Boulevard in Manhattan Beach, California.  A records check of the license plate showed that the vehicle was wanted by LASD in connection with a felony offense and that the occupants were to be considered armed and dangerous.

15.  The officer saw the car on Ardmore Avenue, at the intersection of Pacific Avenue and Marine Avenue.  The officer saw a female black driver in the car and no other passengers. The driver turned eastbound onto Marine Avenue.  The officer confirmed the license plate with dispatch who confirmed the want on the plate.

16.  The officer followed the car eastbound on Marine Avenue, and northbound on Sepulveda Boulevard, until additional MBPD units arrived.  The officer then initiated a traffic stop on the car on Pacific Coast Highway just north of Rosecrans Avenue, in the city of El Segundo, California.  The driver, later identified as HARRIEL.

---

[1] HARRIEL and her father, victim A.T.D., are the registered owners of this car.

17.   As officers detained HARRIEL, an officer asked if she had any weapons on her person, to which HARRIEL responded that she had a firearm in her front right pants pocket.  MBPD Sergeant Hidalgo removed an un-serialized "Polymer80" semi-automatic pistol from HARRIELS's pocket.  The pistol was loaded with six 9mm rounds in the magazine, and one 9mm round in the chamber.

18.   Law enforcement arrested HARRIEL for possession of a loaded, un-serialized, and concealed firearm.

**C.   Law Enforcement Recovers Rounds of Ammunition, Spent Shell Cases, and the SUBJECT DEVICES During a Search of HARRIEL's Car**

19.   During a search of HARRIEL's car, law enforcement recovered an additional magazine loaded with nine 9mm rounds of ammunition in the glove compartment, a box containing thirty rounds of 9mm ammunition in the console of the car, and three spent 9mm shell cases on the floorboard of the car.  Law enforcement also found the SUBJECT DEVICES in the car. Specifically, law enforcement found SUBJECT DEVICE 1 on the driver's floorboard, SUBJECT DEVICE 2 on the passenger seat, and SUBJECT DEVICE 3 on the front passenger floorboard.

**D.   In a Mirandized Interview, HARRIEL Admits to Possessing the Firearm and SUBJECT DEVICES**

20.   During a post-arrest Mirandized interview, HARRIEL made a series of statements to Officer Hanson.

21.   Officer Hanson asked HARRIEL if there was any property in the car that he could retrieve for her.  HARRIEL asked for a

phone to text her husband and said, "Can you text my husband and tell him I fucked up?"

22.  Officer Hanson then asked HARRIEL why she possessed the firearm and she said, "Protection, police be killing mother fuckers out here."

23.  Officer Hanson asked HARRIEL if the firearm was registered to her and she said, "Absolutely not, I'm not able to register it.  I found it on the sidewalk.  It's absolutely illegal, probably."

24.  HARRIEL told Officer Hanson that the car was registered to her but that the only property in the car that belonged to her were the SUBJECT DEVICES and the firearm.

**E.   HARRIEL is a Convicted Felon**

25.  On August 3, 2021, I reviewed criminal history documents for HARRIEL and learned that HARRIEL has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about August 31, 2011, Assault with a Deadly Weapon, in violation of California Penal Code Section 245, in the Superior Court for the State of California, County of Los Angeles, Case Number BA380677;

b.   On or about October 10, 2017, Assault with a Deadly Weapon, in violation of California Penal Code Section 245, in the Superior Court for the State of California, County of Los Angeles, Case Number NA107517.

**F.    Interstate Nexus**

26.   On August 3, 2021, ATF Special Agent and Firearms and Ammunition Interstate Nexus Expert Ryan Catanzano told me that of the ammunition recovered from HARRIEL's vehicle, at least fourteen cartridges/cartridge cases had headstamps with "PMC," and that PMC ammunition was manufactured outside of California. Therefore, the ammunition must have traveled in interstate commerce given that it was found in California.

**V.   TRAINING AND EXPERIENCE ON FIREARMS AND AMMUNITION OFFENSES**

27.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms and ammunition investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms and ammunition, generally maintain records of their firearm and ammunition transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms and ammunition illegally will keep the contact information of the individual who is supplying firearms and ammunition to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms and ammunition, including digital photographs or recordings of themselves possessing or using firearms and ammunition on their

digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

       c.   Those who illegally possess firearms and ammunition often sell their firearms and ammunition and purchase firearms and ammunition.  Correspondence between persons buying and selling firearms and ammunition often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearms and ammunition between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms and ammunition to have photographs of firearms and ammunition they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms and ammunition possession and/or to facilitate sales or transfers of firearms and ammunition.

       d.   Individuals engaged in the illegal purchase or sale of firearms, ammunition and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

28.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

> c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

> d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

> a.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HARRIEL's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of HARRIEL's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

32.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  <u>CONCLUSION</u>

33.  For all of the reasons described above, there is probable cause to believe that HARRIEL has committed a violation of 18 U.S.C. § 922(g)(1): Prohibited Person in Possession of Ammunition.  There is also probable cause that the items to be

//

//

seized described in Attachment B will be found in a search of

the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __4__ day of
___Aug.___, 2021.

_____
HON. GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

14